HON. THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROSEMARY SAFFIOTI, individually and as Personal Representative of the ESTATE OF MICHAEL SAFFIOTI, deceased, and GIOVANNI SAFFIOTI, individually,<br><br>Plaintiffs,<br><br>v.<br><br>SNOHOMISH COUNTY, a municipal corporation, LENNON DEL ROSARIO, BRIAN QUINN, JEFFREY LANGSAM, LAUREN KOOIMAN, LYNDA SIMON, BETTY MARLIN, BETTY LUSK, and ARAMARK CORRECTIONAL SERVICES, LLC, a limited liability company organized under the laws of the State of Delaware,<br><br>Defendants. | NO.  2:14-cv-00361-TSZ<br><br>THIRD AMENDED COMPLAINT (Deprivation of Civil Rights)<br><br>JURY DEMAND |

Plaintiffs allege as follows:

## I.    PARTIES

1.    Plaintiff Rosemary Saffioti is the mother and the duly-appointed Personal Representative of the Estate of Michael Saffioti, deceased.   At all relevant times, Rosemary

THIRD AMENDED COMPLAINT – 1

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

Saffioti was a citizen of the United States and lived in Snohomish County. Ms. Saffioti brings claims individually, and also as Personal Representative of the Estate of her son, Michael Saffioti, deceased, under 42 U.S.C. 1983 and relevant state law.

2.      Plaintiff Giovanni Saffioti is the father of Michael Saffioti, deceased.   At all relevant times, Giovanni Saffioti was a citizen of the United States.  Mr. Saffioti brings a claim individually, under 42 U.S.C. 1983 and relevant state law.

3.      Michael Saffioti, the decedent, was a 22 year old single man who died on July 3, 2012, while housed at the Snohomish County Jail.  At all relevant times, Michael Saffioti was a citizen of the United States, living in Snohomish County, and as such was entitled to all rights, privileges, or immunities guaranteed under state law, federal law, and the Washington State and U.S. Constitutions.   His Estate brings claims through his surviving mother and Personal Representative, Rosemary Saffioti.

4.      At all material times, defendant Snohomish County was a municipal corporation organized under the laws of the State of Washington, which by and through its agency, the Snohomish County Sheriff's Office Corrections Bureau, operated, managed and controlled the Snohomish County "Oakes Street" Jail ("SCJ") and employed, engaged and/or contracted with the remaining named defendants.  Snohomish County is a public body responsible under state law for the acts and omissions of its employees, officials, and contractors, including those whose conduct is at issue.

5.      At all material times, defendant Lennon Del Rosario ("Deputy Del Rosario") was employed by Snohomish County as a corrections deputy, whose duties and responsibilities included providing for the custody and care of inmates, including monitoring inmates' mental and physical health.  At all relevant times, Deputy Del Rosario was acting within the course and scope of his employment.

6.      At all material times, defendant Brian Quinn ("Deputy Quinn") was employed by Snohomish County as a corrections deputy, whose duties and responsibilities included providing

THIRD AMENDED COMPLAINT – 2

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

for the custody and care of inmates, including monitoring inmates' mental and physical health. At all relevant times, Deputy Quinn was acting within the course and scope of his employment.

7.      At all material times, defendants Jeffrey Langsam ("RN Langsam"), Lauren Kooiman ("RN Kooiman"), Lynda Simon ("RN Simon"), Betty Marlin ("RN Marlin"), and Betty Lusk ("RN Lusk") were licensed in Washington as registered nurses and employed by and/or contracted with Snohomish County as nurses at SCJ, whose duties and responsibilities included performing nursing assessments pursuant to defined protocols, assuring that immediate inmate health care needs are met, and coordinating appropriate follow-up care.  At all material times they were acting within the course and scope of their employment and/or agency.

8.      Aramark Correctional Services, LLC ("Aramark") is a company that provides food services for SCJ pursuant to a contract they entered into with Snohomish County. In answer to Plaintiffs' First Amended Complaint, Snohomish County, Lennon Del Rosario, Jeffrey Langsam, Lauren Kooiman, and Betty Marlin have alleged that Aramark is at fault for Michael's death. Snohomish County, Lennon Del Rosario, Jeffrey Langsam, Lauren Kooiman, and Betty Marlin, have alleged that they are not jointly and severally liable and responsible for the Plaintiffs' damages unless Aramark is joined as a party to this action. To avoid Snohomish County, Lennon Del Rosario, Jeffrey Langsam, Lauren Kooiman, and Betty Marlin's attempts to reduce their responsibility and liability, Plaintiffs hereby join Aramark as a party based upon Snohomish County, Lennon Del Rosario, Jeffrey Langsam, Lauren Kooiman, and Betty Marlin's allegation of negligence and proof of fault.

## II.    JURISDICTION, VENUE AND STATUTORY COMPLIANCE

9.      This court has jurisdiction pursuant to RCW 36.01.050 and the Supremacy Clause of Article VI of the U.S. Constitution.

10.     Venue is proper in King County pursuant to RCW 36.01.050 because King County is one of the two nearest judicial districts to Snohomish County.

11.     Tort claims were filed in this matter pursuant to RCW 4.92, et seq., and over sixty

THIRD AMENDED COMPLAINT – 3

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

(60) days have gone by without resolution of the claims.

## III.    FACTS

### A. Defendants' Deliberate Indifference to Michael's Serious Medical Need

12.     On July 2, 2012 at approximately 11:00 a.m. Michael Saffioti (hereinafter referred to as Michael) voluntarily turned himself in to the Lynnwood Police Department on an outstanding warrant stemming from a misdemeanor charge of possession of marijuana.

13.     A booking officer at the Lynnwood Jail determined that due to Michael's medical and diet issues, he could not be properly supervised at the Lynnwood Jail.  It was decided that Michael would be transferred to the Snohomish County Jail where they could better address his medical and diet issues.

14.     Michael remained at the Lynnwood Jail for approximately 2 hours and 42 minutes before being transported on a county cooperative transport bus to the SCJ.  While at the Lynnwood Jail, Michael was not served a meal and had nothing to eat.

15.     The Lynnwood Jail notified the SCJ of Michael's medical and dietary issues.  A Lynnwood Jail internal investigation confirmed that when Michael was booked into the SCJ, his health issues, including his asthma and dairy allergy, were documented in the system.

16.     Upon his booking in to the SCJ, as reflected in an intake questionnaire, Michael notified jail deputies that he suffered from asthma, was allergic to dairy, could suffer "antifalactic"[sic] shock from exposure to dairy, and that he had been hospitalized in the last month following an allergic reaction to bread that contained dairy.

17.     Betty Lusk was the nurse assigned to booking.  She does not recall if she read Michael's medical questionnaire from this booking which documented Michael's severe allergy to dairy.  As described below, although the SCJ had numerous, detailed records from Michael's

THIRD AMENDED COMPLAINT – 4

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1   prior stays documenting the serious risk to his life if exposed to dairy, RN Lusk also does not

2   recall reading this information from any of the prior bookings.  In fact, RN Lusk made an entry

3   in Michael's medical charts during Michael's prior incarceration in December, 2011 that

4   Michael was to have a no dairy diet. She admits that she did not typically read prior entries on

5   medical charts from prior incarcerations.  Although RN Lusk admits that Michael did, in fact, tell

6   her that he had a milk allergy and needed a special diet. RN Lusk admits that she did not email

7   the kitchen about Michael's severe allergy. Instead, RN Lusk claims that she placed a "sticky

8   note" on Michael's chart for "no dairy",  because the SCJ's practice and/or policy required that a

9   "provider" or supervisor cosign before a dietary restriction could be communicated to the SCJ

10  kitchen. According to RN Lusk, she thought that her supervisor "does them as she can fit them

11  in" , and for some unexplained reason, RN Lusk found this practice, which could amount to a

12  day or more of delay before the kitchen was advised of an inmate's severe food allergy,

13  acceptable.  In addition to failing to notify the kitchen, RN Lusk also failed to make any notation

14  on Michael's "move card", which would have followed Michael throughout the jail, regarding

15  Michael's severe allergy to dairy.

16         18.     At all relevant times, Aramark provided, prepared, and cooked all meals at SCJ.

17         19.     Following booking, Michael was assigned to a non-medical unit.  On the morning

18  of July 3rd around 5:46 a.m., a breakfast consisting of oranges, pancakes, oatmeal, and syrup was

19  served. Aramark staff prepared this meal. No special diet trays were sent to the module where

20  Michael was housed, as the jail had failed to place Michael on the list for a special diet.

21  Additionally, no notation had been made on Michael's jail "move card" noting his severe allergy

22  to dairy.

23         20.     When Michael learned that no special diet tray had been sent for him, he

24

THIRD AMENDED COMPLAINT – 5                    **LAW OFFICES OF JAMES S. ROGERS**
                                               1500 Fourth Avenue, Suite 500
                                               Seattle WA  98101
                                               Ph: 206/621-8525  Fax: 206/223-8224

1  approached Deputy Del Rosario and reported his dairy allergy.  Del Rosario informed Michael

2  that he was not on the list for a special diet "since he just got booked", and he directed Michael

3  to either eat the oatmeal or go without because no special tray had been sent up for him.

4       21.     Michael removed the pancake from his food tray, got permission to wash his

5  "spork", and sat down with some other inmates to eat his meal.  After taking a few bites of

6  oatmeal, Michael noted that it tasted differently than the last time he had eaten it at SCJ.

7  Unbeknownst to Michael, who had previously been assured that the oatmeal did not contain any

8  dairy, the SCJ's food service provider had recently changed the recipe and added dairy to the

9  oatmeal.

10       22.     Shortly after eating breakfast, at approximately 6:03 a.m., Michael approached

11  Deputy Del Rosario and told him that he was feeling ill. Michael told Del Rosario that he needed

12  to see a nurse and expressed fear that he was having an allergic reaction.  Deputy Del Rosario

13  told Michael to go into "lockdown" in his cell.  After Michael was locked in his cell, Del Rosario

14  radioed the nurses' station.

15       23.     At approximately 6:05 a.m., Deputy Del Rosario was relieved by Deputy Brian

16  Quinn for a 15 minute break.  Deputy Del Rosario told Deputy Quinn about Michael's condition

17  before leaving. Deputy Quinn admits that while he covered for Del Rosario, he was aware that

18  Michael tried to get his attention by knocking on his window, pressing his call button (which is

19  what inmates push if there is an emergency), pacing about in his cell, while talking about

20  needing to see someone from medical.  Michael pleaded for Deputy Quinn to call 9-1-1, saying

21  he could not breathe. Deputy Quinn ignored Michael's pleas for help, and turned off the

22  emergency call button.

23       24.     Jail surveillance video shows that there was no urgent activity in the module that

24

THIRD AMENDED COMPLAINT – 6

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1   required Quinn's undivided attention or prevented him from checking on Michael.  Instead, it

2   appears that Quinn simply decided to ignore Michael.

3        25.     Before he took his break, Deputy Del Rosario made a call for medical assistance

4   at 6:05 a.m., which was broadcast over the radio; at that time, at least five nurses were present in

5   the medical ward.  One nurse, RN Farris, who was just finishing up her evening shift, described

6   hearing the radio broadcast and observing four other dayshift nurses – RN Kooiman, RN

7   Langsam, RN Simon, and RN Marlin – sitting at their desks, talking to one another, ignoring the

8   call.

9        26.     Another call came over the radio, and again nurses Kooiman, Langsam, Simon,

10  and Marlin continued to talk and ignore the call.  RN Farris pointed out to the day shift nurses

11  that module E4 (Michael's module) was calling.  Still, none of the other nurse responded, so RN

12  Farris called E4 back.

13       27.     RN Farris spoke with Deputy Quinn who relayed Michael's request for a nurse to

14  come see him.  He related concerns about a possible allergic reaction to food that Michael had

15  eaten and described symptoms consistent with an allergic reaction such as Michael's complaint

16  of feeling a "tingling in his mouth" and the need to vomit.  After she hung up, RN Farris told the

17  dayshift nurses, Kooiman and Langsam, that Saffioti was allergic to milk, and that he thought he

18  was now having an allergic reaction.

19       28.     After RN Farris spoke with Deputy Quinn, LPN Dizon, arrived to start her shift.

20  With her shift over, as RN Farris was ready to leave the building, she overheard RN Langsam on

21  the phone talking to a deputy about Michael's condition.  RN Farris retrieved Michael's health

22  service record (HSR) and gave it to RN Langsam.  She then left the building.

23       29.     After arriving for her shift, LPN Dizon also spoke over the phone with Deputy

24

THIRD AMENDED COMPLAINT – 7

1   Del Rosario, and learned that Michael was having some difficulty breathing after ingesting some

2   food and that there was some concern that Michael's condition was deteriorating or worsening.

3   As an LPN, Dizon was unable to respond to medical emergencies except to backup an RN, so

4   she told RN Langsam and RN Kooiman that there was a need for someone to go see Michael.

5   She told them that Michael was either having an asthma attack or an allergic reaction because

6   there had been mention that he ate something and was now having trouble breathing.  When

7   another call for medical assistance for Michael was received, LPN Dizon recalls telling another

8   nurse, "It will just be a matter of time that [sic] a medical emergency will be called on this

9   inmate."

10          30.      At approximately 6:20 a.m., Del Rosario returned from his break and took over

11  his station. Deputy Quinn exited the module and did nothing else to follow up on Michael's

12  condition or care. While Del Rosario stood at his station, jail surveillance video appears to show

13  Michael repeatedly activating his emergency call button and Deputy Del Rosario repeatedly

14  turning it off.  The video also shows that when Michael dropped out of sight from the window on

15  his door cell (which was directly in front of Del Rosario's station), Deputy Del Rosario never

16  walked the short distance to Michael's cell to check on him.

17          31.      At approximately 6:30 a.m., nearly half an hour after Michael first reported

18  suffering from what all knew could be a lethal allergic reaction, Deputy Del Rosario started a

19  module check. He provides no explanation as to why he failed to check on Michael before this.

20  Jail surveillance video shows that there was no urgent activity in the module that required Del

21  Rosario's undivided attention or prevented him from checking on Michael.  Instead, it appears

22  that Del Rosario simply decided to ignore Michael.

23          32.      Based on his past medical history and history of anaphylaxis from exposure to

24  THIRD AMENDED COMPLAINT – 8                    **LAW OFFICES OF JAMES S. ROGERS**
                                                    1500 Fourth Avenue, Suite 500
                                                    Seattle WA  98101
                                                    Ph: 206/621-8525  Fax: 206/223-8224

1   dairy, Michael fully understood that without necessary medical intervention his condition was

2   fatal. Locked inside his cell, as the minutes ticked by, realizing that his pleas for help were being

3   ignored, unable to breathe, before eventually losing consciousness, Michael experienced extreme

4   fear.  Other inmates recognized that Michael had a serious medical need and urged jail officers to

5   get help for Michael.

6         33.      When Deputy Del Rosario arrived at Michael's cell he saw Michael slumped on

7   the floor close to the toilet. He unlocked Michael's cell and attempted to question Michael, but

8   Michael was no longer responsive.  Leaving Michael on the floor of his cell, Deputy Del Rosario

9   returned to his officer station, called the nurses' station, spoke with LPN Dizon, and advised her

10  of Michael's condition.

11        34.      After speaking with the nurse, Deputy Del Rosario returned to Michael's cell,

12  where he describes Michael was "sitting" on the floor, with his head on his bunk. At

13  approximately 6:33 a.m. Deputy Del Rosario finally called a medical emergency declaring that

14  an inmate was having an "allergic reaction".  At that point, Michael was very pale and did not

15  appear to be breathing.

16        35.      Only after the medical emergency had been declared, at approximately 6:38 a.m.,

17  did nurses respond.  At that point, five nurses - Langsom, Dizon, Simon, Kooiman and Marlin -

18  finally arrived to assess Michael.  Of those five nurses, contrary to clear instructions in Michael's

19  health services records, not one brought or administered a dose of epinephrine to Michael.  At

20  approximately 6:39 a.m., while the medical staff began CPR, a jail sergeant called 911, reporting

21  that they had an inmate with a possible allergic reaction.

22        36.      Jail medical staff continued CPR until 6:45 a.m. when paramedics from the

23  Everett Fire Department arrived.  Upon their arrival, medics noted that Michael was asystolic,

24

THIRD AMENDED COMPLAINT – 9           **LAW OFFICES OF JAMES S. ROGERS**
                                      1500 Fourth Avenue, Suite 500
                                      Seattle WA  98101
                                      Ph: 206/621-8525  Fax: 206/223-8224

1   which means he was lacking a heartbeat.  The paramedics continued CPR while they transported

2   Michael to the Emergency Room at Providence Medical Center. Emergency room doctors

3   pronounced Michael's death at 7:41 a.m.

4        37.      SCJ employees had notice and were well aware of the serious risk of death if

5   Michael was exposed to dairy.  In addition to the information provided directly from Michael

6   and the Lynnwood Police Department on the day he was booked, the jail had ample knowledge

7   from Michael's prior health service records from his three prior stays at SCJ.  On one prior stay,

8   after the SCJ had exposed Michael to dairy, he suffered an anaphylactoid reaction, and was

9   rushed to Providence for emergency medical treatment.  In an email describing this medical

10  emergency, a nursing supervisor wrote, "will have anaphylaxis for any exposure even from

11  equipment used for milk product … last time we had to call the aid car.  Yikes."

12       38.      Michael's treating doctor at Northwest Asthma & Allergy had previously faxed

13  47 pages of records directly to the medical unit and authored a letter to SCJ describing the

14  severity of Michael's allergies; the letter explained that severe milk anaphylaxis can trigger

15  asthma symptoms, it criticized SCJ's policy, stating it was "dangerously incorrect" to  minimize

16  Michael's allergy as lactose intolerant, and it stressed that Michael's antibody level was at

17  99.99999% of the allergic reaction, which placed Michael very much at risk for a severe allergic

18  reaction with life threatening potential.

19       39.      Michael's doctor had previously expressly advised SCJ's medical unit that "two

20  doses of epinephrine need to be kept readily available such that they could be accessed within

21  minutes to treat him", and that after administering the epinephrine, jail staff should immediately

22  call 911.

23

24  **B. Snohomish County Jail's Policies, Practices, Customs, and Systematic Deficiencies**

THIRD AMENDED COMPLAINT – 10

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

40.     In July 2013, after various media sources ran stories about what appeared to be an unusual number of deaths at the SCJ, Snohomish County Sheriff's Office Corrections Bureau Chief Jeffrey Miller contacted the Pierce County Sherriff's Office, which operates the Pierce County Jail, to request an assessment of the SCJ medical unit.  In an email to Pierce County, Chief Miller wrote, "We have had 8 deaths at our facility … although I believe most, if not all, followed protocols … we have serious questions on [Sic] the competency of some of the nurses the agencies send us".

41.     The Pierce County Sherriff's Office did not publicly release the results of their assessment of the SCJ medical unit.  In an email, a Captain for Pierce County admits that they deliberately did not email or create any documents from their assessment of SCJ due to concerns about public disclosure requests.

42.     In September 2013, the United States Department of Justice National Institute of Corrections (N.I.C.) conducted an assessment of the Snohomish County Jail's medical, mental health, and suicide prevention practices.  The report summarizing the N.I.C.'s findings from the assessment was released to the public.  The report confirmed that there were a number of systemic and gross deficiencies in SCJ's staffing, facilities, equipment, procedures, and policies (or lack thereof).  In summary, the N.I.C. assessment found that "inadequate health care staffing levels, unqualified intake health screens, absence of clear and formal policies and procedures, and a lack of a functional records system make timely and consistent access to appropriate health care virtually impossible".

43.     The systemic and gross deficiencies of SCJ described by the N.I.C. include, but are not limited to, the following:

a.     health care intake at booking was seriously inadequate because custody staff is

THIRD AMENDED COMPLAINT – 11

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1    not trained to adequately assess inmate health needs, and inmates with serious
     medical problems have gone days without seeing qualified medical staff at
2    booking;

3    b.    in general, the SCJ operates with no approved health care policies and procedures;

4
     c.    the SCJ's health records system is inadequate to support an adequate health care
5          delivery system;

6    d.    health screens and other necessary medical documents are not maintained in an
           inmate's official medical records; and
7
     e.    an inspection of the medical records room showed that files and records are
8          stacked in cabinets and tables in various stages before being filed.  It was clear
           that inmate health records upkeep was a "get to it when you can" activity, due
9          largely to a lack of staffing and the absence of an electronic records system.

10       44.    In addition to these systemic and gross deficiencies, the N.I.C.'s assessment also

11   revealed that there was little to no communication between the line staff, the lieutenant level, and

12   the leadership at the SCJ and that more attention needed to be spent monitoring SCJ's contracts

13   with medical and food services.

14       45.    The Snohomish County Sheriff's Office Internal Investigation into the

15   action/inaction of the defendants also revealed a pattern of deficient practices and policies at the

16   SCJ.  Both the Health Services Administrator, Margot Connole, and Nursing Supervisor, Debbie

17   Bellinger, were aware of these customs which included, but are not limited to, the following:

18   a.    a "problem" where there is a "big delay" in printing out the booking/intake
           medical questionnaire responses;
19
     b.    delay, for up to several days, communicating dietary restrictions to the SCJ
20         kitchen because this required a supervisor's signature and supervisors were only
           available on weekdays during normal business hours;
21
     c.    a lack of medical training for corrections deputies to help them identify when a
22         medical emergency is in progress and when a nurse should be called;

23   d.    no system in place to alert jail staff of an inmate's medical issues or needs learned
           during a prior jail stay; and
24

THIRD AMENDED COMPLAINT – 12

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1

2
      e.     inconsistent practices about what information should be placed on an inmate's move card.

3
## C. Aramark's Negligence

4
     46.     On the morning of July 3, 2012, Corrections Deputy Vernon was working in the

5
jail kitchen when Deputy Del Rosario called.  Del Rosario asked Vernon to check to see if

6
Michael Saffioti was on the list for special diet.'

7
     47.     According to Deputy Vernon, after he determined that there was no record in the

8
computer for a special meal for Michael Saffioti, he advised Aramark personnel that Michael

9
Saffioti needed a special meal because he was "allergic to some stuff."

10
     48.     According to Deputy Vernon, the Aramark personnel responded by refusing to

11
provide a special meal because they did not have a special diet approved by nursing staff for

12
Michael.

13
     49.     According to Ken Batali, a food services expert with 35 years of experience in the

14
food industry retained by Snohomish County to evaluate the food service provided by Aramark,

15
it is his opinion that the food service provided by Aramark fell below the standard of care in the

16
food service industry.  Specifically, when advised of an inmate in E4 with a food allergy, the

17
Aramark employee should have inquired further into the nature of the allergy or medical need

18
and prepared an appropriate meal.

19
     50.     Although a 2005 jail policy stated that a request for a special meal had to be

20
approved by a nursing supervisor before it could be communicated to the kitchen, Aramark

21
policy and practice also allowed for the acceptance of a special meal request by phone.

22
     51.     When Aramark's staff was made aware that an inmate had food allergies, a

23
reasonable expectation is that someone in a culinary supervisory position would have the

24
THIRD AMENDED COMPLAINT – 13

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

1  information and knowledge necessary to explore ingredients and appropriate substitutions.

2  Aramark's procedures suggest that substitute recipes are available at all times.

3       52.    In addition to failing to accommodate the request for a special meal, a review of

4  Aramark's internal "Medical Nutrition Therapy and Religious Meals Manual" which sets forth

5  Aramark's policies, recipes, and procedures for a variety of special diets, shows that Aramark

6  fails to address dairy allergy.  Instead, Aramark only treats milk intolerance.  Suggested menu

7  adjustments for milk intolerance state that "small quantities of dairy items in cooked cereals are

8  allowed."

9

**IV.  FIRST CAUSE OF ACTION: SECTION 1983 – 14TH AMENDMENT VIOLATION –**
10  **DELIBERATE INDIFFERENCE TO MICHAEL'S SAFFIOTI'S SERIOUS MEDICAL**
**NEED**
11
     53.    Jail inmates have the constitutional right to receive and have access to adequate
12
health care.  The constitutional rights of pretrial detainees are <u>at least</u> as strong as those enjoyed
13
by convicted prisoners.  Prisoners are entitled to rights under the Eighth Amendment of the
14
United States Constitution, while the rights of pretrial detainees emanate from the Due Process
15
Clause of the Fourteenth Amendment.
16
     54.    By virtue of the facts set forth above, defendants Del Rosario, Quinn, Langsam,
17
Kooiman, Simon, Marlin, and Lusk deprived Michael's federally protected rights by their
18
deliberate indifference to Michael's serious medical needs.  As a direct and proximate result of
19
the defendants' deliberate indifference to Michael's constitutional rights, he suffered damages
20
including punitive damages in an amount to be proven at trial.
21
     55.    By virtue of the facts set forth above, and as a result of its policies, practices, and
22
customs at the Snohomish County Jail, Defendant Snohomish County caused Michael Saffioti to
23
be deprived of his federally protected rights.  As a direct and proximate cause of Defendant
24
THIRD AMENDED COMPLAINT – 14

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525  Fax: 206/223-8224

1  Snohomish County's deliberate indifference to Michael's constitutional rights he suffered

2  damages in an amount to be proven at trial.

3  **V.   SECOND CAUSE OF ACTION: SECTION 1983 – 14TH AMENDMENT VIOLATION – ROSE SAFFIOTI'S LOSS OF LOVE, COMPANIONSHIP, AND RELATIONSHIP WITH HER SON**

4

5  56.   Parents have long been recognized as having standing to sue for their own losses

6  associated with the wrongful death of a child by officials under 42 U.S.C. 1983.  Parents have a

7  14th Amendment due process claim for their loss of love, companionship and relationship with

8  their child.

9  57.   By virtue of the facts set forth above, defendants Del Rosario, Quinn, Langsam,

10  Kooiman, Simon, Marlin, and Lusk, through their deliberate indifference caused Rosemary

11  Saffioti to be deprived of her constitutional right to love, society and companionship with her

12  son, Michael Saffioti, for which she is entitled to compensatory and punitive damages in an

13  amount to be proven at trial.

14  58.   By virtue of the facts set forth above, and as a result of its policies, practices, and

15  customs at the Snohomish County Jail described above, Defendant Snohomish County through

16  its deliberate indifference caused Rosemary Saffioti to be deprived of her constitutional right to

17  love, society and companionship with her son, for which she is entitled to compensatory

18  damages against Defendant in an amount to be proven at trial.

19  **VI.   THIRD CAUSE OF ACTION: SECTION 1983 – 14TH AMENDMENT VIOLATION – GIOVANNI SAFFIOTI'S LOSS OF LOVE, COMPANIONSHIP, AND RELATIONSHIP WITH HIS SON**

20

21  59.   Parents have long been recognized as having standing to sue for their own losses

22  associated with the wrongful death of a child by officials under 42 U.S.C. 1983.  Parents have a

23  14th Amendment due process claim for their loss of love, companionship and relationship with

24

THIRD AMENDED COMPLAINT – 15

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1 their child.

2     60.    By virtue of the facts set forth above, defendants Del Rosario, Quinn, Langsam,

3 Kooiman, Simon, Marlin, and Lusk, through their deliberate indifference caused Giovanni

4 Saffioti to be deprived of his constitutional right to love, society and companionship with his

5 son, Michael Saffioti, for which he is entitled to compensatory and punitive damages in an

6 amount to be proven at trial.

7     61.    By virtue of the facts set forth above, and as a result of its policies, practices, and

8 customs at the Snohomish County Jail described above, Defendant Snohomish County through

9 its deliberate indifference caused Giovanni Saffioti to be deprived of his constitutional right to

10 love, society and companionship with his son, for which he is entitled to compensatory damages

11 against Defendant in an amount to be proven at trial.

12 **VII.    FOURTH CAUSE OF ACTION:  STATE LAW CLAIM OF OUTRAGE**

13     **62.**    By virtue of the facts set forth above, Snohomish County is liable to the Plaintiffs

14 for the tort of outrage because of the extreme and outrageous nature of its agents' actions, which

15 recklessly inflicted severe emotional distress.

16 **VIII.   FIFTH CAUSE OF ACTION:  NEGLIGENCE**

17     63.    Defendant Snohomish County, through its operation of the Snohomish County

18 Corrections Bureau and SCJ, and Aramark owed Michael a duty of reasonable care while he was

19 in custody.  By virtue of the facts set forth above, defendants' actions and inactions fell well

20 below the standard of care owed Michael, proximately causing his death and making defendants

21 liable for all damages allowed under State law.

22 **IX.    RELIEF REQUESTED**

23     WHEREFORE, Plaintiffs request relief as follows:

24

THIRD AMENDED COMPLAINT – 16

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph: 206/621-8525  Fax: 206/223-8224

1. Compensatory damages, including economic and noneconomic damages, damages for pain, suffering, terror, and loss of consortium pursuant to 42 U.S.C. 1983, in an amount to be proven at trial;

2. Damages, including general and special damages, including economic loss to the estate of Michael Saffioti as may be available under Washington state law, in an amount to be proven at trial;

3. Costs, including reasonable attorneys' fees and costs pursuant to 42 U.S.C. 1988 and to the extent available under the law;

4. Punitive damages against the individual, non-municipal defendants to the extent authorized by law in an amount to be proven at trial;

5. Declaring the defendants jointly and severally liable;

6. Awarding any and all applicable interest on the judgment; and

7. Awarding such other and further relief as the Court deems just and equitable.

Dated: February 26, 2015                    LAW OFFICES OF JAMES S. ROGERS

s/ James S. Rogers
s/ Cheryl L. Snow
s/ Elizabeth J. Donaldson
James S. Rogers, WSBA #5335
Cheryl L. Snow, WSBA #26757
Elizabeth J. Donaldson, WSBA #45291
Attorneys for Plaintiffs
1500 Fourth Avenue, Suite 500
Seattle, WA 98101
Phone: 206-621-8525
Facsimile: 206-223-8224
Email: jsr@jsrogerslaw.com
           csnow@jsrogerslaw.com
           liz@jsrogerslaw.com

THIRD AMENDED COMPLAINT – 17